# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

—————————

**No. ACM 40496**

—————————

**UNITED STATES**
*Appellee*

**v.**

**Jerin P. MENARD**
Senior Airman (E-4), U.S. Air Force, *Appellant*

—————————

Appeal from the United States Air Force Trial Judiciary

Decided 28 March 2025[1]

—————————

*Military Judge*: Michael A. Schrama.

*Sentence*: Sentence adjudged 23 March 2023 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey. Sentence entered by military judge on 25 April 2023: Bad-conduct discharge, confinement for 6 months, reduction to E-1, and a reprimand.

*For Appellant*: Captain Joyclin N. Webster, USAF (argued); Major Matthew L. Blyth, USAF; Major Frederick J. Johnson, USAF.

*For Appellee*: Major Katie E. Lee, USAF (argued); Lieutenant Colonel J. Pete Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Mary Ellen Payne, Esquire.

*Amicus Curiae for Appellant*: Alexis H. Garner (law student, argued); Philip J. Novak (law student); Homer S. Pointer, Esquire (supervising attorney)—Oklahoma City University School of Law, Oklahoma City, Oklahoma.

*Amicus Curiae for Appellee*: Christina Kelly (law student, argued); Cheyene Perez-Bailey (law student); Zachary Schmook, Esquire

—————————

[1] The court heard oral argument in this case on 19 November 2024 at University of Oklahoma, College of Law, Norman, Oklahoma, as part of this court's Project Outreach Program.

(supervising attorney)—University of Oklahoma College of Law, Norman, Oklahoma.[2]

Before JOHNSON, KEARLEY, and WARREN, *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Chief Judge JOHNSON and Judge KEARLEY joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

WARREN, Judge:

At a general court-martial, a panel of officer members convicted Appellant, contrary to his pleas, of one specification of indecent viewing of the private area of his ex-girlfriend and fellow Airman, RH, in violation of Article 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920c.[3] Following his conviction, Appellant elected to be sentenced by the military judge, who in turn sentenced Appellant to a bad-conduct discharge, confinement for six months, reduction to the grade of E-1, and a reprimand. Notably, the adjudged reprimand was omitted from the entry of judgment despite the convening authority issuing reprimand language in his Convening Authority Decision on Action Memorandum, dated 13 April 2023. Ultimately, the convening authority took no action on the findings or sentence.[4]

Appellant raises five assignments of error which we have reworded as follows: (1) whether Appellant's conviction for indecent viewing is factually sufficient; (2) whether the military judge abused his discretion when he admitted

---

[2] Both supervising attorneys for *amicus curiae* students representing Appellant and Appellee were properly admitted *pro hac vice* to practice before this court.

[3] Unless otherwise noted, all references in this opinion to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[4] Neither party requested we remand the case for additional post-trial processing to correct the entry of judgment to include the reprimand. Accordingly, because we may only affirm the portions of a sentence codified in the entry of judgment, we do not affirm the reprimand, and we take appropriate action in our decretal paragraph to disapprove the reprimand. *See* Article 66(d)(1)(A), 10 U.S.C. § 866(d)(1)(A), *Manual for Courts-Martial, United States* (2024 ed.) ("[T]he court may only act with respect to the findings and sentence as entered into the record under . . . [Article 60c, UCMJ, 10 U.S.C. § 860c, *i.e.*, the entry of judgment].").

Appellant's uncharged acts pursuant to Mil. R. Evid. 404(b) under the theory that it was part of a plan or scheme for Appellant to monitor the crime victim, or evidence Appellant had an intent and motive to dominate and control the crime victim;[5] (3) whether the military judge abused his discretion in not excluding portions of the crime victim's unsworn statement where she referenced a continuing course of conduct involving jealousy and control in her relationship with Appellant; (4) whether Appellant was denied a constitutional[6] right to a unanimous verdict; and (5) whether Appellant's conviction for indecent viewing is legally sufficient.[7]

We have carefully considered issues (4) and (5), and find no discussion or relief is warranted. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)). Finding no error that materially prejudiced a substantial right of Appellant in any of the assignments of error, we affirm the findings and sentence.

## I. BACKGROUND

Appellant was convicted of indecently viewing the nude private area of RH without her consent, via a surreptitiously hidden camera he had placed in a stuffed cupcake-shaped toy he previously gave her as a present. This indecent viewing of RH came on the heels of the final breakup of their tumultuous on-again, off-again dating relationship, that began in February 2020. In July 2021, RH ended the relationship for good after she discovered a picture of another woman on Appellant's phone, leading Appellant to admit he was in an "emotional relationship" with another person. Following the end of the relationship, Appellant and RH continued to live in separate bedrooms in the same house while RH began looking for housing elsewhere. During this brief post-relationship housemate phase, Appellant rigged a surveillance camera out of a dog-monitoring camera already in the house. As he later admitted to law enforcement, Appellant cut open the back of the cupcake stuffed toy he had previously gifted RH, placed the camera inside it, carved out one of the eye sockets of the cupcake toy so that the camera would have an inconspicuous line of sight, and then placed the toy on RH's TV stand with a direct line of sight to her bed.

During the week of 15–21 August 2021, RH began to suspect that Appellant was spying on her after receiving a series of text messages where he described to her the exact actions she had just taken in the privacy of her room. On 15

---

[5] We granted oral argument on this particular issue.

[6] U.S. CONST. amend. VI.

[7] Appellant raises issues (4) and (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

August 2021, Appellant texted RH—while he was out walking her dog—"snapping guys[8] again I see." Because their shared apartment was on the third floor, it would have been impossible for Appellant to peer into RH's window from outside and see her phone camera flash from his vantage point on the ground.

On 21 August 2021, Appellant, while out of state attending a softball tournament, texted RH, "[D]id you make any videos today[?]" RH received this text within moments of engaging in a private and intimate act while lying nude and alone on her bed. Appellant then asked RH if she had "brought out any toys?" RH responded, "[U]m no," and "why the f[**]k are you asking me that?" Appellant responded, "Just figure that's what you'd be up to with me gone." Confused and scared, RH left the bedroom, and called her friend, SSgt BS, over FaceTime. SSgt BS convinced her to reenter the bedroom and investigate. After searching her room, RH discovered and unplugged the camera hidden in the eye socket of the stuffed cupcake toy. Within moments after RH unplugged the hidden camera from its power source, Appellant texted her, "Oh look, you caught on[.] Bravo[.]"

Thereafter, RH reported Appellant's actions to military law enforcement and Appellant voluntarily submitted to an interview with the Air Force Office of Special Investigations (AFOSI) personnel. Following a proper rights advisement, Appellant waived his rights and admitted to placing the camera in RH's room without her knowledge and that he used it to surreptitiously monitor her, even conceding: "I admit, I am wrongful for it. I shouldn't have done that." He explained he could view the camera footage via an app on his phone, but that the camera could only broadcast and had no recording capability. However, Appellant denied ever seeing RH nude or engaging in an intimate act through use of the hidden camera, as alleged. When pressed by AFOSI agents as to what motivated him to place the camera, he responded, "[I]t was videoing her without her knowledge, I am aware of that, but this was for me to get my—*to get the truth that I needed*." (Emphasis added). Asked what he would have done had he seen her engaging in sexually intimate acts while viewing her on camera, Appellant asserted to the agents, "I never saw her naked that day. I wasn't watching her masturbate. I wasn't doing any of that. If she did, then *I would have just would have [sic] called her out*. Plain and simple. I called her out for— I would call her out or whatever." (Emphasis added).

---

[8] Based upon common parlance, and finding no countervailing positions in the briefs of the parties, we construe "snapping guys" to involve sending Snapchat messages to males.

The Government admitted Appellant's video-recorded interview into evidence at trial.

At trial, Appellant's trial defense team echoed and argued Appellant's version of events, conceding that he embedded a hidden camera into RH's cupcake toy, but denying he ever used it to surreptitiously view RH nude. Because the camera within the toy had only a broadcasting function and not a recording function, Appellant argued that the Government's evidence was insufficient to prove he ever viewed her "private area" as alleged.[9] Instead, the Defense argued that RH was lying in claiming to have been masturbating just prior to Appellant's otherwise unsolicited remarks such as "make any videos today . . . bring the toys out?" made via text messages.

To bolster circumstantial evidence that Appellant actually sought to and succeeded in viewing RH's private area, the Government successfully admitted, over defense objection, three pieces of Mil. R. Evid. 404(b) evidence for the limited purpose of demonstrating a purported common scheme by Appellant to monitor and control RH:

- Appellant demanded that RH give him the passwords to her social media accounts, including Snapchat and Instagram;

- Appellant took RH's phone during the night while she was asleep and went through her messages (RH knew Appellant had gone through her messages because she would periodically discover entire conversations were deleted after she awoke); and

- Appellant accessed her social media applications (apps) and blocked male friends and ex-boyfriends.

During findings instructions, the military judge instructed the court members they could consider this evidence for the limited purpose of "whether [Appellant] engaged in a course of conduct with [RH] that establishes a scheme to monitor her for the limited purposes of its tendency, if any, to prove a common scheme of [Appellant] to commit the alleged misconduct."

Trial counsel then briefly referenced the admitted Mil. R. Evid. 404(b) evidence as part of the Government's closing argument, asserting,

> [Y]ou can absolutely consider that [Appellant] didn't care about [RH's] expectation of privacy. He has been invading her privacy

---

[9] In the pertinent part, the specification of the charge alleged that Appellant "without legal justification or lawful authorization knowingly and wrongfully view[ed] the private area of [RH] without her consent and under circumstances in which she had a reasonable expectation of privacy."

throughout the relationship. He wants to know who her friends are. He wants to know who she is talking to. He wants to monitor who she is talking to. And beyond that, it's not just enough to monitor, he wants to control that because she told you how he blocked her friends on social media and they weren't females. That's control.

Trial counsel also briefly referenced the Mil. R. Evid. 404(b) evidence once more in the rebuttal argument: "[Trial defense counsel] also said well this case comes down to two text messages. No, it doesn't. It comes down to a year and a half relationship. It comes down to a scheme to monitor her. It comes down to control. It comes down to abuse."

## II. DISCUSSION

## A. Factual Sufficiency—Indecent Viewing

Appellant does not dispute that he surreptitiously placed a camera in RH's bedroom to view her without her knowledge. Rather, he asserts the Government failed to prove beyond a reasonable doubt that he viewed her nude "private area" with the camera he placed. For the reasons set forth below, we are persuaded that the Government's proof, buttressed by Appellant's own admissions, established all elements of the offense beyond a reasonable doubt.

### 1. Law

#### a. Factual Sufficiency

We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, ___ M.J.___, No. 23-0239, 2024 CAAF LEXIS 502, at *5 (C.A.A.F. 6 Sep. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*))). The current version of Article 66(d)(1)(B), UCMJ, governs factual sufficiency review for cases where all offenses were committed on or after 1 January 2021. It states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 2024 CAAF LEXIS 502, at \*8 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.* (footnote omitted).

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id*. at \*10 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id*. at \*12. First, we must decide that evidence, as we weighed it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id*. Second, we "must be clearly convinced of the correctness of this decision." *Id*.

### b. Proof Beyond a Reasonable Doubt

Proof beyond a reasonable doubt does not require proof that overcomes every possible doubt. *See United States v. McClour*, 76 M.J. 23, 24 (C.A.A.F. 2017) (citation omitted). It is enough that the evidence firmly convinces the trier-of-fact of the accused's guilt. *See id*. Furthermore, the Government is free to meet its burden of proof with circumstantial evidence. *United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954) (observing that "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence.")); *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citations omitted) (holding that "[G]overnment is free to meet its burden of proof with circumstantial evidence," and observing that "the ability to rely on circumstantial evidence is especially important in cases . . . where the offense is normally committed in private"). In accessing the evidence for factual sufficiency, we, like the trier of fact at trial, are free to use our common sense and knowledge of the ways of the world. *See, e.g., United States v. Green*, 52 M.J. 803, 805 (N.M. Ct. Crim. App. 2000) (applying the court's own "common sense and knowledge of human nature and the ways of the world" in evaluating witness credibility as part of factual sufficiency review).

### c. Indecent Viewing—Article 120c, UCMJ

Appellant was convicted of indecent viewing in violation of Article 120c, UCMJ, which required the Government to prove the following three elements beyond a reasonable doubt: (1) that Appellant knowingly and wrongfully viewed the private area of RH; (2) that the viewing was without RH's consent; and (3) that the viewing took place under circumstances in which RH had a reasonable expectation of privacy. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 63.b.(1). The term "private area," means "the naked or underwear clad genitalia, anus, buttocks, or female areola or nipple." Article 120c(d)(2), UCMJ, 10 U.S.C. § 920c(d)(2); *MCM*, pt. IV, ¶ 63.a.(d)(2). The term "reasonable expectation of privacy" means "circumstances in which a reasonable person would believe that he or she could disrobe in privacy, without being concerned that an image of a private area of the person was being captured." Article 120c(d)(3), UCMJ, 10 U.S.C. § 920c(d)(3); *MCM*, pt. IV, ¶ 63.a.(d)(3).

### 2. Analysis

Appellant's argument essentially boils down to an assertion that the Government's proof that he viewed RH's private area is deficient because it is circumstantial. We disagree. What Appellant would have us view as coincidental, we find culpable. In sum, we find the evidence conclusively demonstrates, beyond a reasonable doubt, seven facts which together satisfy all elements of the charged offense: (1) the Appellant—by his own admission—surreptitiously hid the camera in a cupcake toy in RH's bedroom; (2) RH had a reasonable expectation of privacy in her own bedroom; (3) the camera was placed on RH's TV stand where it had a direct line of sight to her bed; (4) that on 21 August 2021 RH masturbated alone while nude and on her bed while her private area was facing towards the camera; (5) Appellant texted RH shortly after she completed the above-referenced activity, and made not-so-veiled references to her masturbating; (6) Appellant never had consent to monitor RH with that camera; and (7) RH never discovered or repositioned the camera until after Appellant viewed her private area, as Appellant confirmed in his taunting text, "Oh look you caught on. Bravo."

Appellant offers two main arguments as to the contrary: (a) that the camera angle may have been obstructed; and (b) that the timing of his text messages to RH was coincidental. We address and dismiss each of these, in turn.

### a. Angle of the Camera

We turn first to Appellant's assertions that the camera angle could have excluded a view of RH's bed. RH's sworn testimony avers otherwise, and the picture admitted into evidence at trial depicting the positioning of the hollowed-out cupcake toy clearly establishes that the camera embedded within it

would have had a clear line of sight to RH's bed. Moreover, Appellant's arguments directly contradict his statements to AFOSI wherein he admitted the camera enabled him to view RH on multiple occasions that week. Moreover, during that interview, Appellant never asserted that the view from the camera to the bed was obstructed, or that his view was otherwise impeded.

### b. Timing of Text Messages

Appellant observes that because the camera lacked recording capabilities and thus no footage from the hidden camera is available, the Government is forced to rely upon circumstantial evidence to prove that the camera captured, and Appellant saw, RH's private area. We agree that in a case such as Appellant's, circumstantial evidence is likely to be the only evidence available to the Government. However, merely because factual necessities oblige the Government to rely upon circumstantial evidence does not make that proof insufficient. Thus, while Appellant correctly asserts that the Government failed to secure time logs documenting when he accessed the camera app to view footage from RH's bedroom, that alone does not create reasonable doubt as to whether Appellant indecently viewed her private areas as alleged.

Here, Appellant's contemporaneous and patently incriminating text messages to RH, including "make any videos today" and "pull the toys out," admitted without defense objection at trial, prove Appellant was sending his text messages to RH in a clear reference to observing her use those toys in a private intimate act. On appeal, as at trial, Appellant continues to claim that the timing of the text messages was merely a *coincidence*, and that those text messages just happen to coincide with RH's testimony that she received them just moments after engaging in a private intimate act on her bed. It strains the bounds of credulity to find these statements merely coincidental. Unfortunately for Appellant, in Shakespeare's proverbial phrase, he is ultimately "hoisted by his own petard" in his self-serving denial to AFOSI agents. During that interview, Appellant was adamant that he had not seen RH nude because, if he had, he would have "call[ed] her out on it." Yet, that is *exactly* what he did. In his text message exchange with RH from 21 August 2021, Appellant, in his own parlance, "called her out" by insinuating that she had just masturbated.

While it is conceivable that RH was brazenly lying under oath when she testified that she engaged in this activity, considering the totality of the circumstances, we do not believe that is a "real possibility." In our factual sufficiency review, we, like the trier of fact, are permitted to draw reasonable inferences based upon our common sense and knowledge of the ways of the world. *See Green*, 52 M.J. at 805. Here, it defies common sense that RH would fabricate personally embarrassing details about a private, sexually intimate moment, when the cost of such a fabrication to her would include—at a

minimum—having to repeatedly expose that moment to a succession of investigators and tribunals.

Instead, here, the evidence incontrovertibly demonstrates that Appellant hid the camera in RH's bedroom in direct line of sight of her bed. It further demonstrates he did so motivated by jealousy and frustration at the demise of his relationship with RH and wracked with an irresistible curiosity to confirm if his suspicions about her messaging other men were true. In Appellant's own words, "[he] needed the truth," and, by his own words, he got it—taunting RH with a tongue firmly planted in cheek in a text asking her "make any videos today . . . bring the toys out?" In the end, we find that the timing of Appellant's texts to RH was no coincidence.

Accordingly, after fully reviewing all evidence and testimony admitted at trial and giving the appropriate deference to the trier of fact, we are not clearly convinced the finding of guilty was against the weight of the evidence. Therefore, we find Appellant's conviction factually sufficient.[10]

## B. Admissibility of Uncharged Misconduct

Appellant claims the military judge abused his discretion by admitting the evidence of Appellant's pre-offense monitoring of RH's social media communications and phone communications. We hold that the military judge did not abuse his discretion in admitting evidence of prior uncharged acts of surreptitious surveillance of RH that took place during their dating relationship. Furthermore, any error arising from the military judge admitting prior uncharged acts of "permissive surveillance" was harmless.

### 1. Additional Background

In support of RH's testimony as to the timing of Appellant's text messages and her activities at the time of those messages, the Government sought and ultimately gained admission of three pieces of evidence under Mil. R. Evid. 404(b) offered to demonstrate that Appellant had a "plan or common scheme" to monitor RH or "intent and motive to dominate and control RH": (1) evidence that Appellant threatened to break up with RH if she did not give him the

---

[10] The reader will note that while we reference the disputed Mil. R. Evid. 404(b) evidence in the Background section *supra*, we do not rely upon it as part of our factual sufficiency analysis—this is intentional. For the reasons explained *infra*, we conclude that even if we were to assume arguendo that some of the disputed Mil. R. Evid. 404(b) evidence was erroneously admitted, Appellant suffered no prejudice. Relatedly, as a matter of factual sufficiency, even if we entirely sever the Mil. R. Evid. 404(b) evidence (in an abundance of caution) from our consideration of the case, we conclude the Government's evidence was particularly strong, and we remain unconvinced that the verdict was against the weight of the evidence.

passwords to her social media accounts; (2) evidence that Appellant sometimes took RH's phone while she was asleep and reviewed (and occasionally deleted) her text messages; and (3) evidence that Appellant accessed RH's social media applications and blocked her male friends and ex-boyfriends. For ease of reference in the forthcoming analysis, we will refer to items (1) and (3) as evidence of "permissive surveillance" and item (2) as evidence of "surreptitious surveillance." We use the term "permissive" to indicate those acts of surveillance done with RH's knowledge and acquiescence, whereas we use the term "surreptitious" for those instances where Appellant's acts of surveillance were accomplished without RH's knowledge or consent.

During its oral argument on the Defense's motion in limine, the Government argued Appellant was motivated by jealousy when he hid the camera in RH's bedroom, and his act was "essentially just the last act of that common scheme; of this monitoring, of this checking her social media, of this jealousy over who her friends are, blocking her friends on social media. This is just the final act in that scheme." Trial counsel argued the scheme went directly towards proving whether RH had a reasonable expectation of privacy, and whether Appellant would respect that privacy. Further, trial counsel argued the evidence in question—Appellant's control and monitoring of RH's social media accounts—tended to show it was Appellant who was looking for "evidence" of RH engaging in sexually explicit messaging with men, and thus more likely that he installed the camera and was monitoring its broadcasts for that purpose.

The Defense argued the evidence of the parties "sharing of passwords happened early on in the relationship, [and was] not tied to the offense that happened in August of 2021." Further, trial defense counsel argued that the incidents when Appellant viewed RH's social media accounts and blocked male profiles were not correlated with the charged offense because those uncharged acts all occurred with RH's (at least tacit) knowledge. In general, the Defense asserted that the purported bad acts were not relevant to the charged offense and were merely propensity evidence submitted under the guise of Mil. R. Evid. 404(b)(2).

In a ten-page written ruling, the military judge ultimately admitted all three pieces of the Mil. R. Evid. 404(b) evidence contested in this appeal. The military judge reasoned,

> Taken as a whole, the evidence presented on the motions in regard to [the noticed Mil. R. Evid. 404(b) evidence] generally supports a finding by a reasonable finder of fact that the incidents occurred and that the accused had *an intent and motive to dominate and control [RH] as part of his domestic relationship with her*.

11

> The offered acts . . . are probative of Appellant's desire to moni-
> tor [RH]. They are *probative of a motive to monitor [RH] without
> consent*. Accordingly, there are multiple, non-propensity reasons
> why evidence that the accused engaged in a pattern of behavior
> designed to monitor [RH] within the context of their relationship
> is relevant to the finder of fact.

(Emphasis added). The military judge's Mil. R. Evid. 403 analysis focused on
the context the evidence provided to the charged offense drawing from Appel-
lant and RH's relationship in the months preceding to the charged offense. The
military judge found it to have "significant probative value," concluding, "To
deprive the members of evidence that might inform them as to what the Ac-
cused's relationship with [RH] was like in this case would deprive the members
of critical context that might serve to explain the motivations and intent of the
[Appellant] and [RH]."

### 2. Law

#### a. Standard of Review

We review a military judge's decisions to admit evidence pursuant to Mil.
R. Evid. 404(b) for an abuse of discretion. *United States v. Wilson,* 84 M.J. 383,
390 (C.A.A.F. 2024) (citing *United States v. Hyppolite*, 79 M.J. 161, 164
(C.A.A.F. 2019)). Military judges abuse their discretion (1) "[if] the findings of
fact upon which [they] predicate [their] ruling[s] are not supported by the evi-
dence of record;" (2) if they use incorrect legal principles; or (3) if their "appli-
cation of the correct legal principles to the facts is clearly unreasonable." *Id*. at
390 (citation omitted). "To reverse for an abuse of discretion involves far more
than a difference in . . . opinion . . . . The challenged action must . . . be found
to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous in order to
be invalidated on appeal." *Hyppolite*, 79 M.J. at 166 (omissions in original) (ci-
tation omitted).

#### b. Permissible Non-Propensity Uses of Mil. R. Evid. 404(b), Gen-
erally

Military Rule of Evidence 404(b)(1) provides that evidence of a crime,
wrong, or other act by a person is generally not admissible as evidence of the
person's character in order to show the person acted in conformity with that
character on a particular occasion. However, such evidence may be admissible
for another purpose, including, *inter alia*, proving motive, plan, intent, or the
absence of mistake. Mil. R. Evid. 404(b)(2). The list of potential purposes in
Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Fergu-
son*, 28 M.J. 104, 108 (C.M.A. 1989) (footnote omitted). Military Rule of Evi-
dence 404(b) "is a rule of inclusion rather than exclusion," *United States v.
Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000) (internal quotation marks omitted),

authorizing admission of the proffered evidence so long as it has a legitimate, non-propensity use at trial. Relatedly, this court recognized in *United States v. Moore*, 78 M.J. 868, 876 (A.F. Ct. Crim. App. 2019), and in *United States v. Lull*, No. ACM 39555, 2020 CCA LEXIS 301, *69, 84–85 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.), that an accused's controlling or manipulative behavior over a crime victim may, in appropriate cases, be used for a non-propensity purpose.

### c. Common Plan/Scheme Evidence

Pertinent to this case, evidence of a common plan or scheme has long been recognized as a legitimate, non-propensity purpose under Mil. R. Evid. 404(b). *See, e.g., United States v. Johnson*, 49 M.J. 467, 474–75 (C.A.A.F. 1998); *United States v. Munoz*, 32 M.J. 359, 363–64 (C.M.A. 1991) (citations omitted); *United States v. Reynolds*, 29 M.J. 105, 110 (C.M.A. 1989). However, our superior court's caselaw on this issue appears to have evolved over time. In *United States v. Morrison*, a case upon which Appellant relies, the United States Court of Appeals for the Armed Forces (CAAF) held that to qualify as common plan or scheme type evidence the uncharged acts "must be *almost identical* to the charged acts and each other." 52 M.J. 117, 122 (C.A.A.F. 1999) (emphasis added) (quoting *United States v. Brannan*, 18 M.J. 181, 183 (C.M.A. 1984) (reasoning that the near identicality is necessary "so as to naturally suggest that all these acts were results of the same plan" (citation omitted)).

Twenty years later in *Hyppolite*, the CAAF revisited the parameters of common plan or scheme evidence, and, notably, the majority opinion neither cited to *Morrison* nor mentioned the "almost identical" evidentiary standard. Instead, the CAAF endorsed the *Reynolds* "common factors" test, used by the military judge to assess whether the evidence of uncharged misconduct qualified as a common plan or scheme. *Id.* at 166–67. Applying that analysis, the court affirmed the trial judge's ruling that the evidence of uncharged acts was admissible due to the substantial similarity (1) in the relationship between the alleged victims and the accused; (2) in the surrounding circumstances preceding each instance of the misconduct; and (3) in the nature of the alleged misconduct. *Hyppolite*, 79 M.J. at 166–67 (citing *Johnson*, 49 M.J. at 468–69, 474–75; *Munoz*, 32 M.J. at 360–61, 363–64). Noting the congruence between the analysis undertaken at the trial level in the appellant's case and the court's seminal Mil. R. Evid. 404(b) analysis in *Reynolds*, the majority opinion emphasized that in both cases "the facts of the charged offense and the facts [related

to the uncharged misconduct] *were not exactly the same." Id.* (emphasis added) (citing *Reynolds*, 29 M.J. at 107).[11]

Recently, in *United States v. Greene-Watson,* our superior court did not directly resolve the potential tension between the *Morrison* and *Hyppolite* decisions, deciding instead to unanimously affirm our court's decision construing the scope of "common plan/scheme" evidence based upon the absence of any prejudice to the appellant given the judge-alone forum. *United States v. Greene-Watson*, __M.J. __, No. 24-0096, 2025 CAAF LEXIS 186, at *20–21 (C.A.A.F. 11 Mar. 2025). Nonetheless, a close reading of the majority and concurring opinions indicates that our superior court still regards *Hyppolite's* embrace of a "common factors" test as the current governing standard for "common plan or scheme evidence." *Cf. id.* at *17 ("We also reject [a]ppellant's argument that uncharged conduct must be virtually identical to the charged conduct to be admissible as evidence of a common plan or scheme under [Mil. R. Evid.] 404(b) . . . ." (Johnson, J., delivering the opinion of the Court, joined by Maggs, J.)); *id.* at *26 ("I also agree that the military judge did not abuse his discretion by admitting that evidence." (Hardy, J., joined by Sparks, J., concurring in part and in the judgment)).[12]

### d. The 3-Prong Reynolds Test

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

---

[11] The court acknowledges that the CAAF's earlier decision in *Morrison,* 52 M.J. 117, upon which Appellant relies, might be viewed as incongruous with *Hyppolite*. Indeed, that appears to be Chief Judge Ohlson's opinion. *See Hyppolite*, 79 M.J. at 167 (Ohlson, J., dissenting) (citation omitted) ("I believe the military judges' ruling in this case ran directly afoul of this Court's holding in *United States v. Morrison* . . . .").

[12] The only caveat is Judge Hardy voices a concern in his concurrence that the Court's recent precedents may be becoming too permissive, *vis a vis* common plan/scheme evidence, and that he is open to reconsidering them. *Greene-Watson*, 2025 CAAF LEXIS 186, at *26–27 (Hardy, J., joined by Sparks, J., concurring in part and in the judgment) ("In a future case, I believe that the Court should reconsider that precedent to prevent the common scheme or plan exception from swallowing [Mil. R. Evid.] 404(b)(1)'s general rule prohibiting the admission of propensity evidence."). We defer to our superior court as to whether reconsideration of *Hyppolite* is necessary and/or to determine whether *Hyppolite* was a departure from or an implementation of *Morrison's* rationale. As an intermediate appellate court, our job is simply to follow the binding precedent of our superior court. Thus, we deem it our duty to follow our superior court's precedent in *Hyppolite* unless and until the precedent is overruled.

1. Does the evidence reasonably support a finding by the court members that appellant committed [other] crimes, wrongs or acts?

2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?

3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*Id.* at 162 (alterations in original) (quoting *Reynolds*, 29 M.J. at 109) (additional citations omitted).

As discussed above, the third prong of the *Reynolds* test essentially involves applying a Mil. R. Evid. 403 balancing test. "Ordinarily, appellate courts 'exercise great restraint' in reviewing a [military] judge's decisions under Rule 403." *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997) (citation omitted). "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Ruppel*, 49 M.J. 247, 250 (1998)). However, when a military judge does not, on the record, conduct the balancing inquiry required by the third prong of the *Reynolds* test, we afford that ruling less deference. *United States v. Barnett*, 63 M.J. 388, 396 (C.A.A.F. 2006) (quoting *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005)).

The term "unfair prejudice" for purposes of the Mil. R. Evid. 403 balancing test "addresses prejudice to the integrity of the trial process, not prejudice to a particular party or witness." *United States v. Collier*, 67 M.J. 347, 354 (C.A.A.F. 2009). Thus, within the context of Mil. R. Evid. 403, "'unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (quoting Fed. R. Evid. 403 Advisory Committee's Note). "Members are presumed to follow a military judge's instructions to consider evidence for a proper purpose . . . and not let personal beliefs or feelings affect their determinations . . . ." *Id.* at 355 (citation omitted).

### e. Prejudice Test for Non-Constitutional Error

If we find that the military judged erred in admitting Mil. R. Evid. 404(b) evidence, "[w]hether [that] error is harmless is a question of law we review de novo . . . . For non-constitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). To determine whether an error was thus prejudicial, military appellate courts weigh "(1) the strength of the Government's case, (2) the strength of the [d]efense case, (3) the materiality of

the evidence in question, and (4) the quality of the evidence in question." *Greene-Watson*, 2025 CAAF LEXIS 186, at \*19 (internal quotation marks omitted) (quoting *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019)) (additional citations omitted). In assessing the "materiality" of any erroneously admitted evidence, reviewing CCAs consider a list of the following non-exhaustive factors: (a) "the extent to which the evidence contributed to the [G]overnment's case;" (b) the degree to which "instructions to the panel may have mitigated the error;" (c) the frequency with which the Government referred to the evidence in its argument; and (d) "the extent to which the members could weigh the evidence using their own layperson knowledge." *United States v. Washington*, 80 M.J. 106, 111 (C.A.A.F. 2020) (citations omitted).

### 3. Analysis

Appellant's counsel argues that the military judge abused his discretion because admission of the contested Mil. R. Evid. 404(b) evidence failed the second prong of the *Reynolds* analysis in that it failed to make an act of consequence more or less probable insofar as: (1) Appellant's pretrial admission to placing the camera and watching the footage on different occasions obviated any need for the Government to prove a "common plan or scheme" to place the camera; and (2) that the putative Mil. R. Evid. 404(b) evidence was not sufficiently similar to the charged misconduct to qualify for admission. Appellant further argues that the evidence fails the third prong of *Reynolds* because any probative value was substantially outweighed by the danger of unfair prejudice that the court members would draw a forbidden propensity inference that Appellant was generally a controlling person and therefore likely committed the act as charged.

Before we reach any of these arguments, our threshold inquiry is determining upon which theory the military judge admitted the evidence. His written ruling suggests his analysis explored two theories of admissibility: (1) Appellant's motive and intent to monitor and control RH; and (2) Appellant's common plan or scheme to monitor RH. However, the military judge's findings instructions to the members delineated only the common scheme Mil. R. Evid. 404(b) theory, directing the court members that they may only consider the evidence of previous monitoring for the limited purpose of determining "whether [Appellant] engaged in a course of conduct with [RH] that establishes *a scheme to monitor her* for the limited purposes of its tendency, if any, *to prove a common scheme of [Appellant] to commit the alleged misconduct*." (Emphasis added). Despite the longstanding precedent that CCAs may affirm an

evidentiary ruling of a trial court on any theory presented at trial,[13] in Appellant's case, given the military judge's self-imposed limits on his own ruling, and the appellate briefs of the parties which confined themselves to the limits the military judge functionally imposed upon his ruling in issuing his findings instructions, we will likewise limit our analysis to the theory on which the military judge instructed the court members—common scheme.

Applying the abuse of discretion standard, we conclude the military judge's findings of facts were supported by the record; his conclusions of law utilized correct legal principles, prominently relying upon CAAF's then most-recent precedent in *Hyppolite* for construing common plan or scheme evidence; and his application of the facts to the law was not arbitrary, fanciful, or clearly unreasonable in reference to what we identified *supra* in the additional background subsection as the uncharged acts of "surreptitious surveillance." *See Hyppolite*, 79 M.J. at 166. As for the acts we identified *supra* as "permissive surveillance" evidence, even assuming without deciding that evidence was improperly admitted, their admission was harmless.

Turning first to whether the military judge identified proper legal principles in his ruling, we do not agree with Appellant's assertion that *Morrison* and its "almost identical" standard is the proper filter to evaluate Mil. R. Evid. 404(b) for common plan or scheme evidence. *Cf. Morrison*, 52 M.J. at 122 (citations omitted). As we explained in our recent decision in *United States v. Greene-Watson*, we construe our superior court's much more recent guidance on the subject in *Hyppolite* as the controlling precedent. No. ACM 40293, 2023 CCA LEXIS 542, at *28 n.13 (citing *Hyppolite,* 79 M.J. at 165–66) (additional citations omitted), *aff'd on other grounds*, 2025 CAAF LEXIS 186, at *20–21 (C.A.A.F. 2025). The majority opinion in *Hyppolite* did not utilize the "almost identical" standard previously endorsed by the court in *Morrison*, and, indeed, did not cite to *Morrison* at all. *See Hyppolite*, 79 M.J. at 165 (citing *Munoz*, 32 M.J. at 360, 360–61, 363); *id.* at 166 (citing *Johnson*, 49 M.J. at 474, 475; *Reynolds*, 29 M.J. at 109). Only the dissent cited approvingly to *Morrison. See id.* at 167 (Ohlson, C.J., dissenting). Understanding that our superior court has cautioned the CCAs not to presume that it has overruled one of its precedents *sub silentio, see United States v. Alberry*, 44 M.J. 226, 228 (C.A.A.F. 1996) (citations omitted), it appears even if *Hyppolite* did not overrule *Morrison*, then the majority of the CAAF, at a minimum, considers the *Hyppolite* common factors test as the governing Mil. R. Evid. 404(b) analysis. All of which is to say, the

---

[13] *See United States v. Bess*, 80 M.J. 1, 11–12 (C.A.A.F. 2020) (holding, *inter alia*, that CCAs may affirm a military judge's ruling when the military judge reaches "the correct result, albeit for the wrong reason" (quoting *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003)).

semantic debate about whether *Hyppolite* departs from or implements *Morrison* is a distinction without a difference for our purposes. Our mandate as an intermediate appellate court is clear—to follow binding precedent of our superior court. In a case such as this, where one might perceive a tension between older and newer precedent, we deem it prudent to follow our superior court's most recent precedent in *Hyppolite*, so long as that precedent stands.

Second, in his analysis of "surreptitious surveillance," the military judge properly utilized the roadmap laid out in *Hyppolite* for application of *Reynolds* factors to the common scheme evidence because: (1) the parties were the same; (2) the timeframe was proximate and with no major intervening events which changed any motivations to implement the scheme to monitor RH; and (3) the similarity of the invasions of privacy in the charged and uncharged misconduct were substantially similar.

Third, we conclude that, at a minimum, the act of taking RH's phone—without her knowledge, while she slept, for the purpose of reviewing and sometimes deleting her messages—shares significant common factors to the surreptitious surveillance at the heart of an Article 120c, UCMJ, indecent viewing offense and thus satisfies the *Hyppolite* standard. The gravamen of each action is the same: an invasion of privacy without the knowledge or consent of the victim. While an Article 120c, UCMJ, offense obviously involves physical privacy (*i.e.*, viewing of intimate parts of the body), whereas the surreptitious monitoring of cell phone activity invades *inter alia* private conversations, the similarity between the two acts—a gross invasion of privacy—provides a logical nexus to the fact of consequence in this case: whether Appellant engaged in an ongoing scheme to monitor RH without her knowledge.

While Appellant's brief asserts that no fact of consequence was made more or less likely by allowing the testimony that Appellant surreptitiously scrolled through RH's cell phone as she slept, we conclude that the military judge did not abuse his discretion in discerning that the fact of consequence was whether Appellant had a scheme to surreptitiously monitor RH. The monitoring of her actions in her bedroom, vice the monitoring of her communications, is a difference merely in type, not a difference in kind. The existence of a common scheme by Appellant to monitor RH is at the core of the indecent viewing offense wherein the Government had to prove that Appellant viewed RH without her consent under the circumstances where she enjoyed a reasonable expectation of privacy. Axiomatically, actions taken without RH's knowledge are without her consent because without knowledge she is not afforded an opportunity to enter into a freely given agreement to the conduct at issue.

Appellant's arguments that admission of such evidence lacked probative value because he already admitted to placing the camera are also unavailing. In fact, "the [D]efense's failure to specifically contest [that] issue[ ] did not

remove the Government's burden of proof on these elements of the offense or render this evidence unduly prejudicial." *See United States v. Whitner*, 51 M.J. 457, 461 (C.A.A.F. 1999) (citations omitted). Appellant's common scheme to surreptitiously monitor RH made it more likely that the sole contested element for this charge occurred to wit: that Appellant actually saw RH's private area after he specifically installed a camera in her room in order to monitor her every action. As part of their burden of proof on the indecent viewing offense, the Government had to demonstrate not only that Appellant viewed RH generally, but that he viewed at least one of her private areas specifically. Here a straightforward application of the *Hyppolite* factors supports the military judge's conclusion that the evidence had probative value insofar as it involved Appellant's surreptitious monitoring of the same victim during a proximate time frame leading up to the charged misconduct. In this context, it is certainly probative to whether Appellant ended up viewing her private area because it demonstrates the depth of his contemporaneous desire and commitment to continuously monitor her during the charged timeframe. In other words, it made it much more likely that the man who wanted and needed to know everything about what he suspected were RH's sexually explicit activities and communications, would not turn his head to avoid seeing her engaged in just the type of activity he had installed that camera to transmit.

Applying this logic, we will assume without deciding that the two other pieces of contested Mil. R. Evid. 404(b) evidence— Appellant compelling RH to give him her social media passwords and Appellant logging into RH's social media accounts to, *inter alia*, block her male friends in an effort to monitor and control her behavior—constituted instances of what we call "permissive surveillance" by Appellant of RH. From there, we will assume without deciding that the dissimilarity between permissive and surreptitious surveillance renders those acts insufficiently similar to the charged offense to qualify as common plan or scheme evidence.[14]

---

[14] We limit our analysis to the "common scheme" rubric of Mil. R. Evid. 404(b) because while the military judge's ruling included analysis of under the motive, intent, and common scheme theories of admissibility, his ultimate findings instructions to the member did not. Instead, his findings instructions focused solely on the "common scheme" theory. Thus, we express no opinion as to whether these instances of "permissive surveillance" might qualify as "motive" or "intent" evidence under Mil. R. Evid. 404(b) for purposes of demonstrating Appellant's jealous motivation to intentionally and surreptitiously view RH in what he expected would be her engaging in sexually explicit photo and video messaging with other men. *Cf. Wilson*, 84 M.J. at 393.

Accordingly, having assumed without deciding that the admission of the "permissive surveillance" type evidence might have been in error, we proceed to a prejudice analysis for those items—and we find none. Here, as recounted in this court's analysis, *supra*, of the factual sufficiency of Appellant's conviction, the Government's case was strong whereas the Defense case was weak. The Prosecution was armed with admissions from Appellant that he placed the camera where it was found, plus Appellant's admissions of the jealous motives and suspicions that led him to do so, and his real-time taunting texts with RH wherein he was essentially providing commentary of her actions as he observed them. By contrast, the Defense was saddled with the same implausible and unpersuasive argument that Appellant initially offered law enforcement, namely, that his quip of "make any videos today . . . pull the toys out," by an unhappy coincidence, just happened to fall moments after RH had engaged in a nude physically intimate act on her bed in full view of Appellant's hidden camera. Viewed in this light, the Mil. R. Evid. 404(b) evidence here, while probative to Appellant's plan and scheme to monitor RH generally, was *not necessary* to prove that he indecently viewed RH. By his own admissions to law enforcement and contemporaneous texts to RH, he essentially demonstrated that he did.

---

> We acknowledge that our decision in [*Morrison*] may have muddied the waters . . . .
>
> To the extent that *Morrison* may be viewed as standing for the proposition that (a) intent is not "in issue" in those sexual assault cases where the underlying conduct, standing alone, is overtly sexual in nature, and (b) under such circumstances "intent evidence" automatically fails to survive a [Mil. R. Evid.] 403 analysis to meet the second prong of the *Reynolds* test, that conclusion is not supported by our other case law.

*Id.* In *Hyppolite,*

> [the a]ppellant also argues that the Government, at trial, only sought to use the evidence . . . as proof of a common plan or scheme, and that the Government did not seek, nor did the military judges permit, the evidence to be used as proof of [a]ppellant's intent. The Government responds that the common plan and scheme evidence was intent evidence because mistake of fact was the only issue in controversy. We agree with the Government . . . . [P]roof of a common plan or scheme showed that [a]ppellant "knew what he was doing" when he committed the charged offenses.

79 M.J. at 167; *see also Moore*, 78 M.J. at 875 ("Appellant's controlling behavior demonstrated that he had the motive and intent to repress, instead of respect, her personal autonomy . . . .").

Moreover, the Mil. R. Evid. 404(b) evidence was not "material" in that it was not a significant focus of either the trial counsel's case in chief or their closing argument. Indeed, references to the Mil. R. Evid. 404(b) evidence comprised only 14 lines of trial counsel's 296-line closing argument (that is less than 5 percent) as transcribed in the record of trial. Taken as a whole, trial counsel's case and closing argument overwhelmingly relied upon direct evidence of the charged misconduct—RH's testimony concerning her activities on 21 August 2021 and her discovery of the camera and Appellant's admissions to law enforcement—in urging the court members to convict Appellant. Considering all the other compelling evidence in the case, we are convinced that any erroneously admitted Mil. R. Evid. 404(b) evidence "did not have a substantial influence on the findings." *See Bowen*, 76 M.J. at 87 (citation omitted).

## C. Victim Unsworn Statement

Appellant asserts that the military judge abused his discretion in overruling a defense objection to the portions of RH's victim unsworn statement that allegedly impermissibly referenced uncharged misconduct (including the Mil. R. Evid. 404(b) evidence admitted at trial) and did not qualify as "victim impact" evidence within the meaning of R.C.M. 1001(c)(2)(B). Over the Defense's objection, the military judge permitted passages referring to a continuous course of conduct concerning Appellant's emotional and mental abuse to remain in the statement.

Relying upon R.C.M. 1001(g)(2) and *United States v. Figura*, 44 M.J. 308, 310 (C.A.A.F. 1996), the Government counters that "RH's statements were about evidence that had already been properly introduced during trial on the merits. Thus[,] it was already evidence for purposes of sentencing." Even if we were to assume, without deciding, that the military judge erred in overruling Appellant's objections at trial because the limited use evidence admitted under Mil. R. Evid. 404(b) at findings does not automatically qualify as R.C.M. 1001(c)(2)(B) "victim impact" at sentencing, here we find no prejudice in this judge-alone sentencing context.

### 1. Additional Background

The parties at trial framed this issue as one of whether the emotionally controlling tactics by Appellant during his relationship with RH constituted a "continuous course of conduct" such that they were permissible for comment as "victim impact" during RH's unsworn statement delivered in pre-sentencing proceedings at trial. Over defense objection, the military judge ruled the following passage from RH's victim unsworn statement qualified as "victim impact" within the meaning of R.C.M. 1001(c)(2)(B):

> It's hard to understand living in fear until you have experienced it and I just spent just short of two years of my early adulthood

> in a tumultuous relationship I had with [Appellant]. *The relationship was overshadowed by his jealous accusations, overwhelming insecurity, constant invasion of privacy and emotional and mental abuse* that I did not and do not deserve.

(Emphasis added).

The military judge provided an oral ruling on the record, specifically concluding that the statements were admissible:

> The second and third sentences [of the RH victim impact statement synopsis, *supra*] *I will consider in regard to the charged offense and the evidence that was presented under [Mil. R. Evid.] 404(b) that was consistent with my [Mil. R. Evid.] 404(b) ruling.* Uncharged misconduct is part of a continuous course of conduct involving the same or similar crimes, the same victims and a similar status within the military community may be admitted as evidence in aggravation because such evidence is directly related to the conduct which resulted in conviction. That's from *United States v. Mullens*, 29 M.J. 398 [(C.M.A. 1990)].

> Similarly, *[United States v. Goldsmith*, No. ACM 40148, 2022 CCA LEXIS 8, at *20 (A.F. Ct. Crim. App. 11 Jan. 2022) (unpub. op.)] applied this standard, finding that the "directly . . . relating to or arising from" language in [R.C.M.] 1001(c)(2)(B) is nearly identical to "directly relating to or resulting from" which results to aggravation evidence in [R.C.M.] 1001(b)(4).

> I conclude similarly that the broad victim's rights contained in [R.C.M.] 1001(c) include permitting a victim to discuss a continuous course of conduct of an accused when such course of conduct is directly related to or arising from an offense against that victim of which an accused has been found guilty. The charged offense did not occur in isolation. The inciden[ts] of monitoring were part and parcel of course of conduct on the part of the accused to monitor the victim. Now, I feel based on evidence that was presented at trial, I will be able to give the proper weight to any such instances through the presentation of evidence.

(Emphasis added).

Following the admission of the victim unsworn statement, trial defense counsel presented their sentencing case which included five character letters from noncommissioned officers and family members and both a written and oral unsworn statement by Appellant which included a brief, perfunctory apology to RH. The Government's sentencing case consisted of Appellant's enlisted

performance reports and a Letter of Counseling for a minor disciplinary infraction.

Trial counsel's sentencing argument made no direct mention of RH's victim impact statement and only passing reference to RH's victim impact at all. Instead, trial counsel spent all but two sentences of a sentencing argument that covers 88 lines of trial transcript focusing on the severity of the offense and Appellant's taunting text messages to RH while he was surreptitiously surveilling her. In contrast, trial counsel's brief commentary on other victim impact evidence covers just two brief sentences:

> Your judgment should weigh the impact of [RH] what it will take to ensure that the [a]ccused does nothing like this—nothing like this again . . . [RH] who is one of our own, has lived with the repercussions and pain of what the accused has done for the last year and a half and she will continue to do so for the indefinite future.

### 2. Law

We review a military judge's admission of victim impact statements in presentencing for an abuse of discretion. *United States v. Campos*, __ M.J. __, No. 23-0138, 2025 CAAF LEXIS 141, at *8 (C.A.A.F. 19 Feb. 2025) (citing *United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019)). "Abuse of discretion occurs when the military judge: (1) bases a ruling on findings of fact that are not supported by the evidence; (2) uses incorrect legal principles; (3) applies correct legal principles in a clearly unreasonable way; or (4) does not consider important facts." *Id.* (citations omitted).

For preserved objections, if an error occurs in the admission of sentencing matters the test for prejudice is "whether the error substantially influenced the adjudged sentence." *United States v. Edwards*, 82 M.J. 239, 246 (C.A.A.F. 2022) (footnote and citation omitted). Reviewing courts utilize four factors to access prejudice: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* at *9–10 (citation omitted).

Article 6b(a)(4)(B), UCMJ, 10 U.S.C. § 806b(a)(4)(B), grants victims of offenses under the UCMJ the right to be reasonably heard at a sentencing hearing related to the offense. 10 U.S.C. § 806b(a)(4)(B). A victim afforded this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." Article 6b(b), UCMJ, 10 U.S.C. § 806b(b).

Pursuant to R.C.M. 1001(c)(3), victim unsworn statements "may only include victim impact and matters in mitigation." Victim impact includes "any financial, social, psychological, or medical impact on the crime victim directly

relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001(c)(2)(B). "Although the unsworn victim statement is not subject to the Military Rules of Evidence, this does not mean that the military judge is powerless to restrict its contents." *United States v. Tyler*, 81 M.J. 108, 112 (C.A.A.F. 2021). "[T]he military judge has an obligation to ensure the content of a victim's unsworn statement comports with the parameters of victim impact or mitigation as defined by [R.C.M. 1001(c)]." *Id.* (citation omitted).

This court has previously ruled that caselaw interpreting "victim impact" within the context of R.C.M. 1001(b) aggravation evidence is an appropriate framework to construe the scope of R.C.M. 1001(c) "victim impact" given the similarity of definitions. *See United States v. Goldsmith*, No. ACM 40148, 2023 CCA LEXIS 8, at *20–21 (A.F. Ct. Crim. App. 11 Jan. 2023) (unpub. op). Applying this lens, neither R.C.M. 1001(b) nor, by extension, R.C.M. 1001(c), "authorize the introduction of general evidence of . . . uncharged misconduct." *See United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007) (alteration in original) (quoting *United States v. Nourse,* 55 M.J. 229, 231 (C.A.A.F. 2001)) (additional citation omitted). However, "when uncharged misconduct is part of a continuous course of conduct involving similar crimes and similar victims, it is encompassed within the language 'directly relating to or resulting from the offenses of which the accused has been found guilty' . . . ." *Nourse,* 55 M.J. at 232; *see also United States v. Mullens*, 29 M.J. 358, 340 (C.M.A. 1990) (holding "a continuous course of conduct involving the same or similar crimes, the same victims, and a similar situs within the military community" constituted admissible aggravation evidence under R.C.M. 1001(b)(4)). The purpose of such evidence is to demonstrate the "full" or "true" impact of an appellant's crime. *Nourse,* 55 M.J. at 232 (footnote and citations omitted). In determining whether evidence is "directly related" to the offenses which an appellant was convicted of, we assess whether the evidence is both direct and "closely related in time, type, and/or often outcome, to the convicted crime." *Hardison,* 64 M.J. at 281–82.

However, recently in *Campos*, a decision released roughly two years after conclusion of Appellant's court-martial, the CAAF for the first time declared that its continuing course of conduct theory for admission of victim impact evidence is inapplicable to R.C.M. 1001(c)(2)(B) victim impact. *Campos*, 2025 CAAF LEXIS 141, at *15. In so doing, the court explicitly held that "[a]lthough we recognize similarities between this case and [*United States v. Mullens,* 29 M.J. 398 (C.M.A. 1990)], we decline to extend the holding of *Mullens* with respect to evidence in aggravation under R.C.M. 1001(b)(4) (1984 ed.) to apply to victim impact statements under R.C.M. 1001(c) (2019 ed.)." *Id.*

R.C.M. 1001(g)(2) generally permits the trier of fact to consider: "[a]ny evidence properly introduced on the merits before findings, including:

. . . [e]vidence of other offenses or acts of misconduct even if introduced for a limited purpose . . . ." However, there is a distinction between evidence admitted for a limited purpose during findings under Mil. R. Evid. 404(b), and the use to which that same evidence may be considered as victim impact type evidence at sentencing. *See United States v. Tanner*, 63 M.J. 445, 448 (C.A.A.F. 2006). "[Mil. R. Evid.] 404(b) does not provide a basis for admission of evidence during sentencing that is not otherwise admissible under R.C.M. 1001(b)(4)." *Id.* (citing *Nourse*, 55 M.J. 229; *United States v. Wingart*, 27 M.J. 128, 135–36 (C.M.A. 1988)).[15]

Finally, as the sentencing authority, a military judge is presumed to know the law and apply it correctly, absent clear evidence to the contrary. *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (citations omitted). We also "presume[ ] a military judge follows [his] own rulings." *Id.* (citations omitted). A military judge is also presumed to "distinguish between proper and improper arguments." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted).

### 3. Analysis

Here the military judge overruled the defense objections to the unsworn statement with a key caveat: that he would consider the evidence only for the limited purpose of similar "course of conduct" involving Appellant's systematic monitoring of RH to contextualize the convicted misconduct of Appellant's indecent viewing her via surreptitious monitoring. While that rationale was sound under our prior decision in *Goldsmith*, our superior court's decision in *Campos* now dictates otherwise. The Appellant is entitled to benefit from

---

[15] While not itself a source of law, we note that the *Military Judge's Benchbook* captures this concept and cautions military judges to be wary during presentencing proceedings of misapplication of limited use evidence admitted during findings:

> When evidence has been admitted on the merits for a limited purpose raising an inference of uncharged misconduct by the accused, there is normally no sua sponte duty to instruct the court members to disregard such evidence in sentencing, or to consider it for a limited purpose. Although the court in sentencing is ordinarily permitted to give general consideration to such evidence, *it should not be unnecessarily highlighted. Evidence in aggravation must be within the scope of RCM 1001(b).* The military judge must ensure that the [G]overnment does not invite the members to sentence the accused for uncharged misconduct.

Dep't of the Army Pamphlet 27-9, at 1788 (29 Feb. 2020) (emphasis added); *see also United States v. Riley*, 72 M.J. 115, 122 (C.A.A.F. 2013) ("[T]he Benchbook is not binding as it is not a primary source of law, the Benchbook is intended to ensure compliance with existing law.").

changes in the law decided during the course of his appeal. *See United States v. Rose*, 71 M.J. 138, 144 (C.A.A.F. 2012) (citation omitted); *see also Johnson v. United States*, 520 U.S. 461, 468 (1997) (holding that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal-- it is enough that an error be 'plain' at the time of appellate consideration"). Accordingly, while the military judge did not have the benefit of *Campos* at the time of trial, as a matter of law, *Campos* obliges us now on appeal to find plain error in the military judge's decision to admit this "course of conduct" evidence.

However, as our superior court did, we take pains now to point out that our decision here should *not* be read as an invalidation of the "continuing course of conduct" caselaw vis a vis R.C.M. 1001(b)(4) victim impact evidence. *See Campos*, 2025 CAAF LEXIS at *15–16 n.5. The court in *Campos* grounded its decision in due process concerns for admission of this type of information in the context of a victim impact statement where the Military Rules of Evidence do not apply and where an unsworn statement is not subject to adversarial testing via cross-examination. *Id.* at *15. Axiomatically, those concerns do not pertain to witness testimony adducing R.C.M. 1001(b)(4) "continuing course of conduct evidence" because in that instance an accused would have the ability to cross-examine the witness.

Because *Campos* compels us to find error in the admission of "continuing course of conduct" information within RH's victim impact statement, we proceed to a prejudice analysis. Here, we are convinced that the erroneous portion of RH's unsworn victim impact statement did not substantially impact the sentence adjudged and therefore find no prejudice in the context of this judge-alone sentencing case.

As to the first and second factors, as recounted in the factual sufficiency analysis of Appellant's conviction, *supra*, the strength of the Government's evidence in this case was high, compared to the Defense. Adding to the strength of that evidence from a sentencing perspective was the mocking tone Appellant adopted in his taunting texts of RH as he prodded her towards panic in his real-time veiled references to her activities in what was supposed to be the privacy of her own bedroom. We find his concluding jab of "Oh look you caught on. Bravo," to be a particularly aggravating fact and circumstance of the convicted misconduct.

Third, the materiality of the challenged portions of the victim unsworn statement were low where neither side referred *directly* to these brief passages in their sentencing arguments. That modest mention limited any possibility the military judge would accord any undue weight to this evidence. Moreover, trial counsel's brief, oblique reference to the victim impact RH suffered primarily referenced the emotional pain she had endured from the charged misconduct alone.

Fourth, evaluated in light of *Campos*, the "quality" of RH's brief reference to the continuous course of emotional and mental abuse she experienced at the hands of Appellant was "low" because, as CAAF explained in *Campos*, "[t]he accusations were not sworn and were not tested by cross-examination . . . were very brief and contained little or no detail about the harm they may have caused." *Campos*, 2025 CAAF LEXIS 141, at *17.[16]

Finally, the relative severity of Appellant's misconduct—surreptitiously placing a camera in his ex-girlfriend's bedroom which he used to monitor her, view her nude, and brazenly taunt her while doing so—compared with the military judge's decision to impose only half of the maximum confinement available for this offense, are some indicia that the military judge did not ascribe significant weight to these passages from RH's unsworn victim impact statement. In a case where trial counsel requested ten months of confinement and a bad-conduct discharge, the military judge sentenced Appellant to six months' confinement and a bad-conduct discharge. Under the circumstances, we are convinced that any erroneously admitted portions of RH's unsworn victim impact statement had no substantial impact on the sentence, and thus, hold that their admission was harmless.

**D. Excessive Post-Trial Delay**

**1. Additional Background**

Appellant's record of trial was originally docketed with this court on 25 July 2023. Appellant requested and was granted six enlargements of time, amounting to 270 days or 9 months of total delay, to file his assignments of error before filing his brief on 17 April 2024. The Government filed its answer brief on 17 May 2024. Appellant then filed his reply brief on 22 May 2024. Thereafter, with the consent of both parties, on 19 November 2024, this court held oral argument on issue (2). In sum, with the additional time allotted by this court to facilitate the oral argument, a little under 21 months elapsed between the docketing of Appellant's case and the issuance of this opinion.

**2. Law**

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 132 (C.A.A.F. 2006) (citation omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not

---

[16] This is not to denigrate or question the sincerity of RH in offering these impacts in her victim unsworn statement. Rather, our assessment of the "quality" of these statements in her victim unsworn statement as "low" utilizes the legal construct our superior court has mandated in assessing the likelihood that these particular statements had a substantial impact on the military judge's sentencing determination.

completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." 63 M.J. at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. 135 (citations omitted).

The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

### 3. Analysis

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno*, there is a facially unreasonable delay. Although we note the 18-month threshold was exceeded by roughly five weeks, under similar circumstances where that delay was primarily occasioned by extended periods of defense-requested delay we have held that such delays are not "excessively long." *See, e.g., United States v. Washington*, No. ACM 39761, 2021 CCA LEXIS 379, at *109 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (holding that 23 months from case docketing to issuance of the court's opinion was "not excessively long" in a five assignment of error case resulting in three separate opinions from the panel).

Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we do not find any. Appellant has already completed his term of confinement and has lodged no claims that he suffered any oppressive conditions of incarceration while confined. To date, Appellant has also not entered any request for speedy appellate review nor raised any particularized anxiety or concern as a consequence of the pendency of appellate proceedings before this court. Accordingly, we find no prejudice from any unreasonable delay. Absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. In sum, we find no violation of Appellant's due process rights.

Furthermore, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

### III. CONCLUSION

The findings are correct in law and fact. We affirm only so much of the sentence as provides for a bad-conduct discharge, six months of confinement, and reduction to the grade of E-1. As modified, the sentence is correct in law and fact. No error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and modified sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court